1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICHAEL PALMASON, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WEYERHAEUSER COMPANY, WEYERHAEUSER ASSET MANAGEMENT LLC, MORGAN STANLEY, NORTHWATER CAPITAL MANAGEMENT, INC., PATRICIA M. BEDIENT, SALIM SHARIFF, RICHARD J. TAGGART and JOHN AND JANE DOES 1-20,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT |

## I.    INTRODUCTION

1.    This is a class action brought on behalf of the Weyerhaeuser Retirement Plan for Salaried Employees (the "Salaried Plan") and the Weyerhaeuser Retirement Plan for Hourly Employees (the "Hourly Plan") (together the "Plans") pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), against the fiduciaries of the Plans for violations of ERISA.[1]

2.    Weyerhaeuser Company ("Weyerhaeuser" or "the Company") is the sponsor and administrator of the Salaried Plan and the Hourly Plan.  The assets of these Plans were pooled together for investment purposes in a Master Retirement Trust ("Master Trust") until August

---

[1] Effective December 31, 2010, the Hourly Plan was merged into the Salaried Plan, resulting in the Weyerhaeuser Pension Plan.  *See* p. 73 of the 2010 10-K.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

2008.  After August 2008, the Master Trust held assets of the Salaried Plan and the Hourly and, according to the 2009 Form 5500 filed with the Department of Labor on October 11, 2010 for the Weyerhaeuser Company Master Trust ("2009 Master Trust 5500") had approximately $3.75 billion in net assets as of December 31, 2009.

3.     Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of, and for the exclusive purpose of providing benefits to the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets from January 1, 2006 to the present (the "Class Period").

4.     Plaintiff alleges that during the Class Period the Defendants breached their fiduciary obligations of prudence and loyalty to the Plans by causing or permitting the Master Trust to invest more than 81% of its assets in alternative investments (including 53% in hedge funds and 24% in private equity) by December 2007, even though they knew or should have known that such investments were unduly risky and represented an inappropriate investment allocation for pension assets.  This inappropriately large allocation to alternative investments was adopted as part of a "portable alpha strategy," where the selected "alpha" producing managers theoretically outperform the return that would be predicted based on the correlation of each of manager's portfolio to the benchmark portfolio.  The "beta" of the entire portfolio (a measure of correlation to the benchmark) is then readjusted through the purchase of derivatives to match pre-selected benchmark portfolio (the "targeted benchmark")[2] while limiting risk to match that targeted benchmark.  Because the fiduciaries of the Plans whose assets comprised the Master Trust dramatically miscalculated the risk and correlation to the targeted benchmark of the alternative investments chosen to generate "alpha," this strategy as executed exposed the Master Trust to excessive risk causing it to lose $2.4 billion (or 41% of its value) in 2008 including a

---

[2] According to Defendant Richard J. Taggart, Weyerhaeuser's former vice president and treasurer, and who was the head of the pension fund's investment committee from 2003-2007, the Master Trust's risk is measured against a portfolio of 60% S&P 500 index, 35% Lehman Brothers Long T-Bond index and 5% U.S. Treasury bonds.

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 2

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

1    loss of approximately 30% in the 4th quarter alone.  In fact, rather than outperforming its

2    benchmark, as a portable alpha strategy is designed to do, the Master Trust underperformed its

3    benchmark by 27% in 2008, and did not yield any material outperformance in 2009 or 2010

4    despite the excess risk taken on by the Defendants in what was a rising market.

5        5.      By their actions Defendants failed to adopt and implement an investment policy

6    that properly minimized the risk of loss.  Instead, the Defendants exposed the Master Trust to an

7    inherently risky alternative investments strategy and magnified that risk with the purchase of

8    derivatives, which allowed the Company to gamble with retirement assets held for the benefit of

9    the Plans' participants and beneficiaries in an attempt to achieve higher returns and outperform

10   the market.[3]  This over-allocation to alternative investments and the concomitant difficulty of

11   assessing the risk presented by those investments, which was part of a portable alpha strategy,

12   conferred no actual or potential benefit to the Plans' participants and beneficiaries; if it failed

13   (and it did), the Plans' participants and beneficiaries paid the price in the increased risk to their

14   pensions and if it succeeded the Company would profit on what had been significantly

15   overfunded pension plans.  Defendants sought higher returns to improve the Company's

16   financial statements (not to benefit the participants of the Plans), by either lowering the

17   Company's pension costs or increasing its pension income, which would improve the Company's

18   bottom line and earnings per share.  As described below, in order to justify the Company's

19   assumption that the return on pension assets would outperform the market, the Defendants

20   adopted and implemented an investment policy (the "Investment Policy", defined further below)

21   that utilized a portable alpha strategy and bet on risky alternative investments, such as hedge

22   funds and private equity, to generate the alpha (or excess return).  This inappropriately risky

23   investment strategy caused Weyerhaeuser's pension plan assets (including the assets of the

24   Master Trust) to fall from being overfunded by $2.1 billion at the end of 2007 to being

25   underfunded by $450 million just one year later, thereby jeopardizing the retirement benefits of

26

---

[3] Because the Plans are defined benefit plans, the participants and beneficiaries do not reap the rewards of higher returns.  Those returns are booked as additional income to the Company.

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 3

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

the Plaintiff.[4]  As a result of the sharp change in funded status and the illiquidity of the alternative investments in the Master Trust totaling approximately 80%, in 2009 the Company's pension plans were forced to borrow $285 million from the Company in order to pay its annual benefits.

6.      In particular, Defendants breached their fiduciary duties by investing in a stunningly large number of alternative investments (approximately **330** different hedge funds, private equity investments, and real estate funds).  As discussed below, the magnitude of the number of alternative investments prevented the Defendants from properly ascertaining the degree of correlation each alternative investment had with the targeted benchmark and properly rebalancing that correlation using derivatives.   In essence it was nearly impossible for the Defendants to properly manage the risk of 330 alternative investments to ensure that such investments resulted in no more risk than the targeted benchmark.

7.      Defendants also breached their fiduciary duties of prudence by failing to perform adequate due diligence.  As further described below, alternative investments (*e.g.*, hedge funds and private equity) pose significant risks and challenges that demand greater expertise and effort on the part of fiduciaries than traditional investments.  These include among other things:  lack of transparency because fiduciaries have limited information about the underlying investments and/or the valuation of such investments; limited liquidity due to the absence of a public market; greater exposure to operational risks including trading errors and/or outright fraud by any of the hundreds of managers utilized by the Master Trust; and the inherent risk that comes with greater reliance upon the skill and strategies of individual investment managers as compared to the market as a whole.  Again, given the shear number of alternative investments (approximately **330** different hedge funds, private equity investments, and real estate funds), it would be

---

[4] The overfunded status of the Company's pension plans as of 2007  is calculated as the difference between the fair value of the Company's pension plan assets and the benefit obligation of the Company's pension plans as reported on pp. 82-83 of the Company's 2008 10-K.  The underfunded status of the Company's pension plans as of 2008 is calculated as the difference between the fair value of the Company's pension plan assets (as updated in the Company's first quarter 2009 10-Q) and the benefit obligation of the Company's pension plans as reported in the 2008 10-K.

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 4

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

1    prohibitively expensive and time consuming for the Defendants to perform adequate due

2    diligence on each of its 330 alternative investments.

3        8.    Specifically, Plaintiff alleges in Count I that Weyerhaeuser and the Investment

4    Committee Defendants (defined below) breached their fiduciary duties to the Plans in violation

5    of ERISA by failing to establish and maintain a prudent investment policy for the assets of the

6    Master Trust.  In Count II, Plaintiff alleges that the Investment Manager Defendants (defined

7    below) breached their fiduciary duties to the Plans in violation of ERISA by failing to properly

8    implement the Investment Policy and prudently invest the Assets of the Master Trust.  In Count

9    III, Plaintiff alleges that Weyerhaeuser and the Investment Committee Defendants, who were

10   responsible for the selection, monitoring and removal of the Plans' other fiduciaries responsible

11   for the management and investment of the Plans' assets, failed to properly monitor the

12   performance of their fiduciary appointees and remove and replace those whose performance was

13   inadequate.  In Count IV, Plaintiff alleges that Defendants breached their duties and

14   responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties

15   to the Plans.

16       9.    This action is brought on behalf of the Plans and seeks to recover losses to the

17   Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a) (2),

18   29 U.S.C. §§ 1109 and 1132(a) (2).  In addition, under § 409, 502(a)(2) as well as 502(a)(3) of

19   ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including,

20   without limitation, injunctive relief and, as available under applicable law, constructive trust,

21   restitution, equitable tracing, and other monetary relief.

22       10.    ERISA §§ 409(a), 502(a)(2), and 502(a)(3) authorize participants such as the

23   Plaintiff to sue in a representative capacity for losses suffered by the Plans as a result of breaches

24   of fiduciary duties.  Pursuant to that authority, Plaintiff brings this action as a class action under

25   Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plans during the Class

26   Period.

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 5

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

11.     Plaintiff Michael Palmason ("Plaintiff") alleges the following based upon his own personal information and the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Weyerhaeuser, including Weyerhaeuser's, annual reports (Form 10-K), quarterly reports (Form 10-Q), current reports (Form 8-K), proxy statements, a review of the Forms 5500 filed by the Weyerhaeuser with the U.S. Department of Labor ("DOL"), a review of Corporate Governance Guidelines for the Board of Directors of Weyerhaeuser ("Corporate Governance Guidelines"), interviews with participants of the Plans, and a review of available documents governing the operations of the Plans.

12.     Because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are made by necessity upon information and belief.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations.  At such time as Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiff's claims.

## II.    JURISDICTION AND VENUE

13.     **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

14.     **Personal Jurisdiction.**  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them.

15.     **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Weyerhaeuser has its principal place of business in this district.

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 6

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

### III.   PARTIES

**A.     Plaintiff**

16.     **Plaintiff Michael Palmason** is a resident of Centralia, Washington.  He worked for Weyerhaeuser beginning in January, 1990, and left the Company in May, 2002.  On information and belief, during his employment with Weyerhaeuser, Palmason accumulated over 12 years of vesting service and became vested in the Salaried Plan.  He is currently entitled to receive a benefit from the Salaried Plan when he reaches the age of 55.  Palmason is, therefore, a participant of the Salaried Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

**B.     Defendants**

17.     The Defendants are identified below.  All of the Defendants are fiduciaries of the Plans within the meaning of ERISA, as is explained below in Section V ("Defendants' Fiduciary Status"), and all of them breached their fiduciary duties in various ways as is explained in Section VIII ("Causes of Action").

18.     **Defendant Weyerhaeuser Company** is organized under the laws of Washington State with its principal place of business in Federal Way, Washington.  Weyerhaeuser is one of the world's leading suppliers of paper and packaging products and involved in almost every facet of the forest products industry.  Its current market capitalization is $5.9 billion.

19.     **Members of The Weyerhaeuser Investment Committee (the "Investment Committee" and the "Weyerhaeuser Investment Committee").**  The Investment Committee has the responsibility and authority for (i) approving the appointment and termination of Investment Managers, (ii) setting the investment policy[5] for the assets held under the Master Trust Agreement, (iii) monitoring and overseeing the performance of the Investment Managers, and (iv) the management, acquisition, disposition and investment of assets of the Plans to the extent such responsibility and authority is not delegated to one or more of the Investment

---

[5] The term "Investment Policy" refers to the policy set by the Investment Committee as described herein.  The term "investment strategy" refers more generally to the strategy adopted and implemented by the Defendants to invest and manage the assets of the Master Trust.

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 7

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

Managers or the Trustee.  The members of the Investment Committee during the Class Period include:

20.    **Defendant Patricia M. Bedient ("Bedient")** has been Executive Vice President and Chief Financial Officer of Weyerhaeuser since 2007. As the Chief Financial Officer she is the Chairperson of the Investment Committee for the Plans.  During the Class Period, Bedient also served as Senior Vice President, Finance and Strategic Planning, from February 2006 to 2007, and as Vice President, Strategic Planning from February 2003 to 2006.  Prior to joining the Company, Bedient was a partner with Arthur Andersen LLP (Independent Accountant) from 1987 to 2002 and served as the managing partner for the Seattle office and as the partner in charge of the firm's forest products practice from 1999 to 2002.  Under Section 10.1(f) of the Salaried Plan Document, Bedient, as Chief Financial Officer of Weyerhaeuser had the authority and responsibility to select the members of the Investment Committee.

21.    **Defendant Richard J. Taggart ("Taggart")** served as Executive Vice President and Chief Financial Officer of Weyerhaeuser from April 2003 to April 2007.  During the Class Period, Taggart served as the Chairperson of the Investment Committee for the Plans.  Under Section 10.1(f) of the Salaried Plan Document, Taggart, as Chief Financial Officer of Weyerhaeuser, had the authority and responsibility to select the members of the Investment Committee.  Defendant Taggart was also the head of the pension fund's investment committee from 2003-2007.

22.    **Defendant Salim Shariff ("Shariff")** was named chief investment officer (CIO) of the Plans in April 2004.  Shariff also oversees the company's Canadian defined benefit plan. The CIO post was created internally to combine the investment committees that oversee the U.S. and Canadian defined benefit plans  *See Weyerhaeuser selects Shariff to be firm's first defined benefit plan CIO*, Pensions & Investments, April 19, 2004.  Mr. Shariff is also the President of a Company investment subsidiary, Weyerhaeuser Asset Management (also a Defendant, as described below).  Prior to joining Weyerhaeuser in 2004, Mr. Shariff was a Managing Director

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 8

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

1  and Portfolio Manager at Northwater Capital Management (also a Defendant, as described

2  below) and an Executive Director at Morgan Stanley Alternative Investment Partners.  Before

3  Shariff was named CIO, plan manager Morgan Stanley (also a Defendant, as described below)

4  had handled that function.

5      23.  **Defendant Members of the Weyerhaeuser Investment Committee  - John and**

6  **Jane Doe 1-10.**  Other than Defendant Bedient, who served as the Chairperson of the

7  Weyerhaeuser Investment Committee, and Defendant Shariff, Plaintiff does not currently know

8  the identity of the remaining members of the Weyerhaeuser Investment Committee during the

9  Class Period.  Therefore, the remaining members of the Weyerhaeuser Investment Committee

10  are named fictitiously, as Defendants John and Jane Doe 1-10.  Once their true identities are

11  ascertained, Plaintiff will seek leave to join them under their true names.  Defendant Bedient,

12  Shariff, Taggart, and John and Jane Does 1-10 are collectively referred to as the "Investment

13  Committee Defendants."

14      24.  **Defendant Morgan Stanley** is an Investment Manager of the Plans with

15  authority and responsibilities as provided in a written agreement, as approved and /or amended

16  from time to time by the Investment Committee, including the authority and responsibility to

17  invest funds of the Plans in accordance with investment policy approved by the Weyerhaeuser

18  Investment Committee.  Morgan Stanley operates as a Qualified Professional Asset Manager

19  (QPAM) under the Department of Labor's Prohibited Transaction Class Exemption 84-14 (PTE

20  84-14).

21      25.  **Defendant Northwater Capital Management, Inc. ("Northwater")** is an

22  Investment Manager of the Plans with authority and responsibilities as provided in a written

23  agreement between Northwater, Weyerhaeuser, and the Investment Committee, dated October 5,

24  2001, including the authority and responsibility to invest funds of the Plans in accordance with

25  investment policy approved by the Weyerhaeuser Investment Committee.  Northwater also

26  operates as a QPAM under the Department of Labor's Prohibited Transaction Class Exemption

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 9

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

1   84-14.  Effective July 1, 2009, Northwater's investment management duties were transferred to

2   WAM.

3       26.     **Defendant Weyerhaeuser Asset Management LLC  ("WAM")**  is a wholly

4   owned subsidiary of Weyerhaeuser is registered with the Securities and Exchange Commission

5   as an investment advisor under the Investment Advisors Act of 1940.  WAM acts as the third

6   Investment Manager of the Master Trust along with Morgan Stanley and Northwater with the

7   authority and responsibilities as provided in the investment management agreement effective

8   June 29, 2004, between the Investment Committee and WAM, including the authority and

9   responsibility to invest funds of the Plans in accordance with the Investment Policy approved by

10  the Weyerhaeuser Investment Committee.  WAM operates as an in-house asset manager

11  (INHAM) under Department of Labor's Prohibited Transaction Class Exemption 96-23 (PTE 96-

12  23).

13      27.     **Investment Manager Defendants.**  Morgan Stanley, Northwater Capital

14  Management, Inc., and Weyerhaeuser Asset Management LLC are collectively referred to as the

15  "Investment Manager Defendants."

## IV.   THE PLANS

**A.     Nature of the Plans**

18      28.     The Plans, sponsored by Weyerhaeuser Company, are "employee pension benefit

19  plans," as defined by ERISA § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  Each is a

20  noncontributory "defined benefit plan" within the meaning of ERISA § 3(35) of ERISA, 29

21  U.S.C. § 1002(35) and a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C.

22  § 1132(d)(1).  While the Plans are not parties to this action, pursuant to ERISA, the relief

23  requested in this action is for the benefit of the Plans, pursuant to ERISA § 502(a)(2), 29 U.S.C.

24  § 1132(a)(2).

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

**B.    The Plan Documents**

29.    The assets of an employee benefit plan, such as the Plans here, must be "held in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the Plans were held in the trust by Mellon Bank N.A. in the Master Trust pursuant to the Master Trust Agreement.

30.    An employee benefit plan, such as the Plans, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

31.    During the Class Period, the Salaried Plan was maintained pursuant to the Weyerhaeuser Retirement Plan for Salaried Employees Restatement Effective as of January 1, 2005 (the "Salaried Plan Document").

32.    Plaintiff does not have copies of the plan documents pursuant to which the Hourly Plan is maintained.  On information and belief, Plaintiff asserts that the applicable provisions of such plan documents as they relate to the investment policies of the Trusts and assets held under the Master Trust for such plans, the investment performance of the investments of such plans, and the monitoring and oversight of investment performance of such plans, is substantially identical to comparable provisions of the Salaried Plan Document described herein.

**C.    The Purpose of the Plans**

33.    The purpose of the Plans is to provide retirement benefits to the eligible employees of participating companies who are participants in the Plans and their beneficiaries. *See* Salaried Plan Document, Introduction.

**D.    Plan Contributions**

34.    The Salaried Plan is a noncontributory plan under which the Company makes all contributions to the Plan.  The Salaried Plan Document provides that:

> Weyerhaeuser, on behalf of itself and other Participating Companies, shall make, or shall cause one or more other Participating Companies to make, such contributions to the Trust as Weyerhaeuser determines, with the advice of its actuary, are required to maintain the Plan on a sound actuarial basis.

Salaried Plan Document § 11.2.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

**E.**     **Weyerhaeuser Retirement Plan for Salaried Employees**

35.     The Notes to the Financial Statement for the Weyerhaeuser Company Retirement Plan for Salaried Employees for December 31, 2009 and 2008 ("2009 Salaried Plan Financial Statement") describes the Salaried Plan as follows:

**Plan Description**

The Weyerhaeuser Company Retirement Plan for Salaried Employees (the Plan) is a defined benefit, noncontributory plan maintained by Weyerhaeuser Company (the company or plan sponsor) for salaried employees of the company and participating subsidiaries. The Plan also covers certain hourly-production employees that are covered by the Company's salaried benefit programs. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

\* \* \*

The Plan provides pension benefits based on the employee's highest monthly earnings for five consecutive years during the final 10 years before termination of employment. The benefit formula is an excess formula integrated with Social Security Covered Compensation determined in the year of termination. The Plan has a minimum defined benefit dollar amount equal to $25 per month for each year of credited service. Eligible earnings for benefit accrual are generally derived from base pay plus certain bonuses.

Effective January 1, 2010, the Plan was amended to reflect the following changes:

a. **Benefits accrued** under the Plan for service on or after January 1, 2010 **are reduced**.

\* \* \*

c. The **lump sum payment option will be eliminated** for benefits accrued on or after January 1, 2010. Participants will also have the option to receive benefits accrued for service on or after January 1, 2010 in seven annual installments.

d. The **minimum monthly pension benefit available under the Plan will be increased** from $25 per year for all years of credited service to $35 per year for all years of credited service.

Participants are vested in their accrued benefits after accruing five years of vesting service, attaining age 65, or if they are involuntarily terminated except for violations of certain Company employee conduct standards as set forth in the Plan. Participants who were active during 2002 are fully vested. Participants are first eligible for retirement after attaining age 55 and accruing at least 10 years of vesting service. Normal retirement is at age 65.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC 20005
TELEPHONE: (202) 408-4600

The normal form of benefit under the Plan is a single life annuity for unmarried participants, and a 100% joint and survivor benefit for married participants. Lump sum payouts are generally only available to those eligible to retire under the Plan. Certain other participants may also qualify to receive lump sum payouts if the values of their plan benefits do not exceed an amount as specified under the Plan.

(emphasis added)

**F.    Weyerhaeuser Retirement Plan for Hourly Employees**

36.    The Notes to the Financial Statement for the Weyerhaeuser Company Retirement Plan for Hourly Employees for December 31, 2009 and 2008 ("2009 Hourly Plan Financial Statement") describes the Hourly Plan as follows:

**Plan Description**

The Weyerhaeuser Company Retirement Plan for Hourly Rated Employees (the Plan) is a defined benefit noncontributory plan maintained by Weyerhaeuser Company (the company or plan sponsor) for hourly rated employees at multiple locations throughout the United States of America who are not participants in any other company retirement plan. Employees subject to collective bargaining are only eligible if the terms of their collective bargaining agreement provide for retirement benefits under the Plan. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

\* \* \*

The Plan is composed of a base document and 38 separate plan parts which generally provide a retirement benefit based on a specified benefit dollar amount per month for each year of credited service. The dollar amount and benefit eligibility varied depending on the specific plan part. Participants are vested in their accrued benefits after accruing five years of vesting service or attaining age 65. Immediate, full vesting is provided for specified locations for involuntary terminations, except for violations of certain Company employee conduct standards as set forth in the Plan.

The normal form of benefit under the Plan is a single life annuity for unmarried participants, and a 100% joint and survivor benefit for married participants. Lump sum payouts are available to employees of certain locations specified under the Plan.

**G.    The Investments of the Plans In the Master Trust and the Benefit Obligations of the Plans in the Plans' Financial Statements**

37.    As of December 31, 2009, the Salaried Plan Financial Statement reported that the Salaried Plan had net assets available for plan benefits of $1,511,460,170, which amount

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

represented 40.2% of the assets of the Master Trust.  The reported actuarial present value of accumulated benefits of the Salaried Plan as of December 31, 2009, was $1,347,125,591.  *See* p. 3, 7 of Notes to Salaried Plan Financial Statements.

38.     As of December 31, 2009, the Hourly Plan Financial Statement reported that the Hourly Plan had net assets available for plan benefits of $2,244,774,699, which amount represented 59.8% of the assets of the Master Trust.  The reported Actuarial present value of accumulated benefits of the Hourly Plan as of December 31, 2009 was $1,293,366,159. *See* p. 3, 6 of Notes to Hourly Plan Financial Statements.

39.     As of December 31, 2009, the Master Trust reported total investments of $4,067,700,000.  *See* 2009 Financial Statement of the Salaried Plan.  As of December 31, 2009, 82% of the assets of the Master Trust were invested in alternative investments, including 46% in hedge funds, 33% in private equity funds, and 2% in real estate funds.  *Id.*

## V.     FIDUCIARY STATUS OF THE DEFENDANTS

40.     *Named Fiduciaries.*  ERISA requires every Plan to provide for one or more named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the Plans instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).  As further described below, Weyerhaeuser Company, the sponsor and administrator of the Plans, is a named fiduciary of the Plans.  *Id.*

41.     *Investment Managers*.  Under ERISA, an investment manager is a fiduciary. ERISA defines investment manager as:

(38) any fiduciary (other than a trustee or named fiduciary, as defined in section 1102 (a)(2) of this title)—

(A) who has the power to manage, acquire, or dispose of any asset of a plan;

(B) who

(i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b-1 et seq.];

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 14

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

(ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b-3a (a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;

(iii) is a bank, as defined in that Act; or

(iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(c) has acknowledged in writing that he is a fiduciary with respect to the plan.

Section 3(38), 29 U.S.C. § 1002(38).

42.     Each of the Defendants was a fiduciary with respect to the Plans and owed fiduciary duties to the Plans and its participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

43.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to:

(A) act solely in the interest of the participants and beneficiaries of the plan they serve and "(A) for the exclusive purpose of : (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan";

(B) to manage and administer the Plans investments "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims";

(C) to diversify the investments of the Plans so as to minimize the risk of large losses;  and

(D) to act in accordance with the documents and instruments governing the plan.

**A.     Weyerhaeuser's Fiduciary Status**

44.     Under Section 11.1 of the Salaried Plan Document, "Weyerhaeuser has established the [Master] Trust and appointed the [Master] Trustee to hold and administer the assets of the Plan in such [Master] Trust, in accordance with the terms of the Master Trust." On information and belief, the Hourly Plan Document similarly provides that the assets of the

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

Hourly Plan are held in the Master Trust and appoints the Master Trustee to hold and administer the Assets of the Hourly Plan in accordance with the terms of the Master Trust.[6]   By appointment of the Master Trustee, Weyerhaeuser exercised fiduciary powers with respect to the Plans.

45.     Weyerhaeuser is identified in the Master Trust Agreement as the "Named Fiduciary."   Under the Master Trust Agreement, which defines "Asset Manager" as "the Named Fiduciary or Investment Manager," Weyerhaeuser is also is an "Asset Manager."

46.     Weyerhaeuser's powers, duties and responsibilities as a Named Fiduciary and Asset Manager of the Master Trust are set forth in Section 5.1 entitled, "Investment Discretion and Appointment of Investment Managers," which provides:

> The Funds [of the Master Trust] shall be invested and reinvested at such times or times in such investments and pursuant to such investment strategies or course of action and in such shares and proportions as the Asset Managers, in their sole discretion, shall deem advisable.  The Named Fiduciary shall have the power to appoint and remove one or more Investment Manager, which may be an affiliate of the Master Trustee.

47.     As an Asset Manager, Weyerhaeuser exercised discretion in the investment and reinvestment of the Funds of the Master Trust.

48.     On information and belief, Weyerhaeuser exercised its appointment power and appointed the Investment Manager Defendants (Morgan Stanley, Northwater Capital and WAM). By appointing  the Investment Manager Defendants, Weyerhaeuser had an ongoing fiduciary responsibility to monitor them to ensure that they: (1) acted prudently in managing the assets of the Master Trust and (2) acted in compliance with the Investment Policy.

49.     In light of the foregoing duties, responsibilities, and actions, Weyerhaeuser was a named fiduciary of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) in that Weyerhaeuser exercised discretionary authority or discretionary control over the management of the Plans and exercised authority and control over the Plans' assets.

---

[6] The Master Trust Agreement names Mellon Bank, N.A. as the "Master Trustee".

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

**B.     Fiduciary Status of the Investment Managers Morgan Stanley, Northwater and WAM**

50.     Morgan Stanley, Northwater and WAM are all named as "Investment Managers" under Section 10.1(f)(iii) of the Salaried Plan Document, which provides that: "Each Investment Manager shall have such duties and responsibilities as shall be stated in the terms of its respective investment management agreement, as approved by the Investment Committee, including, without limitation, the authority and responsibilities to (1) Manage the investment of the [Master Trust] in accordance with the investment policy approved by the Investment Committee, applicable investment guidelines and other agreed terms; . . . ."

51.     Under Section 1.39 of the Salaried Plan Document, each "Investment Manager" is, by definition, an Investment Manager within the meaning of Section 3(38) of ERISA and a "party to which fiduciary discretion is delegated for the investment of designated Plan Assets."

52.     Additionally, under Section 10.1(f)(iii)(B) and (C), Morgan Stanley and Northwater, in their capacity as Investment Managers, have "the authority, responsibility and discretion to appoint Investment Managers with respect to any assets for which [each] is acting as Investment Manager."

53.     Consequently, in light of the foregoing duties, responsibilities, and actions, Investment Managers Morgan Stanley, Northwater and WAM were named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) in that each exercised discretionary authority or discretionary control over the management of the Plans and exercised authority and control over the Plans' assets.

**C.     The Fiduciary Status of Defendants Bedient, Taggart, Shariff and the Defendant Members of the Investment Committee**

54.     Section 10.1(f) of the Salaried Plan Document states in relevant part:

The Investment Committee shall consist of a Chairperson, who shall be the Chief Financial Officer, and no less than three other voting members.  The Chief Financial Officer shall select the voting members of the Investment Committee and the committee shall have the authority and responsibility to:

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

(i)     Periodically monitoring the investment performance of the Plan assets held in Trust;

(ii)    Adopt, maintain, and modify an investment policy for the Trust and the assets held under the Master Trust Agreement, as further described in Section 10.2 below;

(iii)   Monitor and oversee the performance of each Investment Manager.

55.     From 2007 to the present Defendant Bedient has served as Executive Vice President and Chief Financial Officer of Weyerhaeuser.

56.     As the Chief Financial Officer of Weyerhaeuser, Bedient is the Chairman of the Investment Committee and the fiduciary responsible for selecting and monitoring the Defendant Members of the Investment Committee.

57.     From 2005 to 2007 Defendant Taggart served as Executive Vice President and Chief Financial Officer of Weyerhaeuser.

58.     As the Chief Financial Officer of Weyerhaeuser, Taggart was the Chairman of the Investment Committee and the fiduciary responsible for selecting and monitoring the Defendant Members of the Investment Committee.

59.     On information and belief, Defendant Shariff has served on the Investment Committee for some or all of the Class Period.  In addition, as the Chief Investment Officer, Shariff was in charge of the day-to-day management of the Plans' assets held in the Master Trust.  Shariff's duties included but were not limited to: implementing the investment strategy of the Plans, evaluating and selecting new investments and managers; monitoring, managing and exiting from existing investments and managers; assessing the performance, risks and liquidity of individual investments and the portfolio as a whole; monitoring the Investment Managers and other service providers hired by the Plans (including Morgan Stanley, Northwater and WAM); and performing due diligence on all the investments in the Master Trust's portfolio.

60.     Defendants Bedient, Taggart, Shariff and the other Members of the Investment Committee were also responsible under Section 10.2 of the Salaried Plan Document for the establishment of "an investment policy consistent with the purposes of the Plan and the

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 18

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

requirements of applicable law, as appropriate from time to time," and, on information and belief, during the Class Period participated in the establishment and implementation of the Investment Policy of the Plans adhered to by the Investment Manager Defendants.

61.     Under Section 10.2 of the Salaried Plan Document Defendants Bedient, Taggart, Shariff, and the other Members of the Investment Committee also had "responsibility and authority with respect to the management, acquisition, disposition or investment of Plan Assets to the extent such responsibility and authority is not delegated to one or more Investment Managers or the Trustee."

62.     Under Section 11.8 of the Salaried Plan Document, Defendants Bedient, Taggart, Shariff and the other Members of the Investment Committee "ha[ve] the power to appoint, remove, or change from time to time an Investment Manager to direct the investment of all or a portion of the [Master] Trust Fund held by the Trustee."

63.     Defendants Bedient, Taggart, Shariff and the other Members of the Investment Committee were also responsible under Section 10.1(f) of the Salaried Plan Document for establishing the duties and responsibilities of the Investment Managers and approving investment management agreements with each of the Investment Managers setting forth their duties and responsibilities.

64.     Finally, under the terms of the Master Trust Agreement, each member of the Investment Committee is a Named Fiduciary as the "Investment Committee" is defined as "the committee acting as a Named Fiduciary with respect to the investment of assets under the Plans."

65.     Consequently, in light of the foregoing duties, responsibilities, and actions, Defendants Bedient, Taggart, Shariff and the Members of the Investment Committee were named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that each exercised discretionary authority or discretionary control with respect to management of the Plans, exercised authority or control with respect to management or disposition of the Plans' assets

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
COHEN MILSTEIN SELLERS & TOLL, PLLC.
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC 20005
TELEPHONE: (202) 408-4600

and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## VI.   FACTS BEARING ON FIDUCIARY BREACH

**A.    Defendants Adopt a Portable Alpha Strategy & Invest Heavily in Hedge Funds and Private Equity to Enhance the Returns of the Master Trust**

66.    By at least 2005 the Investment Committee Defendants or their predecessors had adopted, and the Investment Manager Defendants implemented, the Investment Policy which used a "portable alpha" investment strategy designed to outperform a chosen benchmark index while limiting risk to match that pre-selected portfolio (the "targeted benchmark").  In general terms, a portable alpha strategy is one where the portfolio manager separates alpha from beta by investing in securities that differ from the stated benchmark index from which the beta is derived.  Alpha is the return achieved over and above the return that results from the correlation between the portfolio and the targeted benchmark (the correlation with the benchmark is the beta).

67.    According to Defendant Richard J. Taggart, Weyerhaeuser's former Chief Financial Officer and Member of the Investment Committee, the Master Trust's risk is measured against a portfolio of 60% S&P 500 index, 35% Lehman Brothers Long T-Bond index and 5% U.S. Treasury bonds.

68.    The success of a portable alpha strategy required achieving two goals. The first is alpha generation, where alpha is the excess return of each alpha generating manger's portfolio relative to the expected return of a hypothetical portfolio with the same beta.  An alpha of zero provides no excess return, a positive alpha of 1.0 means the fund has outperformed its benchmark by 1%, and an alpha of -1.0 would indicate an underperformance of 1%.  Simply stated, alpha is often considered to represent the value that the skill of a portfolio manager adds to or subtracts from his portfolio's return.

69.    The second aspect of a portable alpha strategy is the proper evaluation and management of the portfolio's beta, which is the extent to which the portfolio moves with a

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 20

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

targeted benchmark. Beta measures the degree of correlation between the portfolio of each alternative investment manager and the benchmark. Beta is calculated using regression analyses. A beta of 1.0 indicates that the portfolio's returns will track almost exactly that of the benchmark. A beta of less than 1.0 means that the portfolio will be less volatile than the benchmark. A beta of greater than 1.0 indicates that the portfolio's return will be more volatile than the benchmark. For example, if a given alternative investment manager's portfolio's beta is 1.2, it is 20% more volatile than the benchmark. Simply stated, beta is a measure of the risk and return conferred on a portfolio by virtue of its correlation with the targeted benchmark portfolio as a whole. In the absence of alpha, if the targeted benchmark portfolio rises by 10%, a portfolio with a beta of 1.2 is expected to rise 12%. If the targeted benchmark declines by 10%, the portfolio with a  beta of 1.2 is expected to decline by 12%.

70.     John S. Coates [7], who was vice president of Weyerhaeuser and managing director of the pension fund investments group until early 2000, helped to implement the Master Trust's shift away from traditional investments. As Coates has written, a portable alpha strategy involves "compiling a well-diversified portfolio of alpha-generating managers regardless of the asset classes in which they operate." *See* "Transporting Alpha to Enhance Institutional Portfolio Results," *Morgan Stanley Investment Management Issues of Interest*, John S. Coates, Spring 2004, at 3. In the Master Trust, the alpha-generating portion of the portfolio is the 81-88% allocation to hedge funds, private equity and real estate funds (collectively the alternative investments). Coates further explains the second part of a portable alpha strategy: "Once an attractive mix of managers is selected, the embedded betas, if any, in the portfolio are assessed and the [portfolio manager] then creates an overlay employing futures, options, swaps or other contracts to add or subtract exposures to particular asset classes in order to achieve the desired total asset allocation." *Id*. The description of the investment strategy employed by the Investment Manager Defendants in Form 5500s filed by Plans is very similar to the strategy

---

[7] Coates is currently a managing director and chief investment officer of Morgan Stanley Dean Witter Alternative Investment Partners.

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 21

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

described by Coates above:  "When implementing the investment strategies of the Master Trust, the portfolio managers of the Master Trust utilize swaps, futures or options, to help manage the liquidity of the Master Trust, to achieve a target asset mix, and to gain exposure to the return characteristics of specific financial strategies.  The resulting asset mix achieved is intended to allow the assets of the Master Trust to perform comparably with established benchmarks. . . Each investment and overlay position's exposure to the asset classes in the target asset mix is determined separately and the portfolio is re-balanced to the target asset mix as needed.  The Master Trust utilizes options and swaps to manage liquidity, to rebalance the portfolio to its core asset allocation targets which are set forth in the Master Trust's investment policy and to maintain exposure to core investment strategies."  *See* p. 13-14 of December 2008 Master Trust Financial Statements filed with the Form 5500 for the Salaried Plan and the Form 5500 for the Hourly Plan.  In accordance with this strategy, the Master Trust reported holding $2.9 and $2.0 trillion (notional value) of swaps and other forward contacts as of December 2007 and 2008 respectively.

71.    For a portable alpha strategy to be successful in practice, the portfolio manager must pick alpha-generating investments that really do outperform a hypothetical portfolio with the same beta while at the same time properly assessing the betas (or risk) of the alpha generating investments and managing that risk through derivatives to ensure that the total risk in the portfolio is no greater than that of the targeted benchmark.

72.    As part of their portable alpha strategy, the Investment Manager Defendants sought alpha, *i.e.*, returns in excess of the targeted benchmark, by dramatically increasing the Master Trust's allocation to alternative investments including hedge funds, private equity, and real estate funds.  As reported by Pensions & Investments:

> In the mid-1980s, Weyerhaeuser's pension fund began turbocharging its investment strategy by developing a fund-of-funds approach in which all the pension assets are invested in hedge funds and private equity funds.  The pension fund does not invest in stocks and bonds directly.  Rather, it uses derivatives such as equity and fixed-income futures overlaid upon the hedge funds and private equity funds to give it exposure to the equity and fixed-income markets,

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

according to sources who are familiar with the pension fund's strategy and who spoke on condition of anonymity.

\*..\*..\*

One reason Weyerhaeuser invests in hedge funds and private equity funds is because it theoretically justifies the company's assumption that its pension fund will average a long-term rate of return of 11.5%.  The investment return corporations assume on their pension funds is important because it is one of the key drivers of their pension cost. A higher return on pension assets automatically lowers a company's pension cost, or can boost a company's pension income – which flows through to a company's bottom line and, in turn, to earnings per share.

Weyer's assumed return of 11.5% is the highest of more than 1,000 of the nation's corporations, including those in the Standard & Poor's 500 stock index. It's also 230 basis points above the 9.2% average in a Watson Wyatt Worldwide survey of more than 400 corporations last year, and higher than the S&P 500's average return for the past 74 years.

Anand, Vineeta, TURBOCHARGED PORTFOLIO: Weyerhaeuser uses derivatives to justify assumed return of 11.5%, *Pensions & Investments*, June 25, 2001.

73.    The Investment Management Weekly similarly reported that on March 17, 2000, Morgan Stanley Dean Witter & Co. of New York ("Morgan Stanley") hired six-investment managers from Weyerhaeuser to help launch a new venture to expand the firm's alternative investment products, such as hedge funds and venture capital.  John Coates, then manager of the Weyerhaeuser pension fund, became the chief investment officer of the new firm, while Putnam Coes, then a vice president in Morgan Stanley's investment management group, became its chief operating officer.  The new venture was intended to boost Morgan Stanley's alternative asset management business by responding to rising demand from institutional clients and wealthy individuals.  *Weyerhaeuser Team Joins Morgan Venture*, Investment Management Weekly, March 27, 2000.

74.    On March 27, 2000, Weyerhaeuser transferred its entire $3.5 billion pension portfolio to Morgan Stanley, of which $2 billion was invested in alternative asset classes.  *Id.*

75.    Indeed, the current Investment Policy adopted by the Investment Committee Defendants and implemented by the Investment Manager Defendants, who were responsible for the management, acquisition and disposition of the majority of the assets of the Master Trust

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 23

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

1   during the Class Period, includes a "mix of nontraditional strategies, including **hedge funds**,

2   **private equity**, opportunistic real estate, and **other externally managed alternative investment**

3   **funds**" (the "Investment Policy").

4   76.     The Defendants' actions caused the Master Trust assets to be shifted away from

5   traditional investments and into hedge funds and private equity throughout the Class Period

6   despite the increased risks and costs associated with these alternative investments as further

7   discussed below.

8   77.     Beginning with the 2003 Weyerhaeuser 10-K the Company began disclosing the

9   allocation of the assets of its "Qualified and Registered Pension Plans" by asset categories.  The

10  10-K stated that as of December 2002, over 92% of the assets of the Weyerhaeuser pension plans

11  were invested in alternative investments: 32.2% in private equity funds, 43.3% in hedge funds,

12  and 16.9% in real estate funds.  As of December 2006, 84% of the assets of the Weyerhaeuser

13  pension plans were invested in alternative investments: 26.3% in private equity funds, 53.4% in

14  hedge funds, and 3.9% in real estate funds.   The allocations to alternative investments were

15  substantially similar in 2007, 2008, 2009 and 2010.

16  78.     In short, the Investment Policy adopted by the Investment Committee Defendants

17  and implemented by the Investment Manager Defendants utilized a portable alpha strategy and

18  was heavily reliant on hedge funds and private equity for alpha generation, in an attempt to

19  outperform the market, despite the increased risks and costs associated with these types of

20  alternative investments.  *See* discussion *infra*.

**B.     The Increased Risk & Costs Associated with Investing in Hedge Funds**

22  79.     "Pension plans face a number of challenges in hedge fund investing beyond those

23  of more traditional investing, including specific investment risks, limited transparency, and

24  liquidity, and risks related to the operations of the hedge fund."  *See* GAO Report of

25  Congressional Requestors, "DEFINED BENEFIT PENSION PLANS – Guidance Needed to

26  Better Inform Plans of the Challenges and Risks of Investing in Hedge Funds and Private

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 24

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

Equity"  GAO-08-692, a report to congressional requestors (August 14, 2008) (the "GAO Report") at 22.

80.     Frequently, investors in hedge funds cannot get their money out easily because hedge funds usually impose "lock-up" periods that require investors to commit their money for periods of one or two years or more.  The lock-up period allows managers to invest in less-liquid assets without having to worry that investors will want their money back before the investments have matured.  Moreover, even after the lock-up period has ended, investors in hedge funds frequently cannot redeem their investments at will.  Rather, redemptions are limited to specified window periods with a pre-notification requirement.  Liquidity limitations can inhibit a plan's ability to minimize investment loss and increase the risk of investing in hedge funds.

81.     As one commentator explained about hedge funds:

> The investment strategies of hedge funds are often not well known, or are so lacking in transparency – even to their own investors (prospectuses are often written to allow funds a great deal of latitude in crafting their investment strategies) – that the investors cannot adequately assess the hedge fund investment's contribution to their overall portfolio risk.  Without a thorough knowledge of the hedge fund investment strategy, the investor can [not] determine whether they are diversifying into independent, uncorrelated assets or not.

*See* Testimony Randall Dodd, Director of the Financial Policy Forum, Washington D.C., before the U.S. Department of Labor, Employee Benefits Security Administration:  Advisory Council on Employee Welfare and Pension Benefit Plans, September 20, 2006 ("Dodd Testimony").

82.     Because the investment holdings and investment strategies of many hedge funds are often not well known, it makes it difficult for the fund assets to be marked to market.  As the GAO Report explains:

> Because many hedge funds may own thinly traded securities and derivatives whose valuation can be complex, and in some cases subjective, a plan may not be able to obtain timely information on the value of assets owned by a hedge fund. Further hedge fund managers may decline to disclose information on asset holdings and the net value of individual assets largely because release of such information could compromise their trading advantage.  In addition, even if hedge fund managers were to provide detailed positions, plan sponsors might be unable to fully analyze and assess the prospective return and risk of a hedge fund.  As a consequence, a plan may not be able to independently ascertain the value of its

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

hedge fund investment or fully assess the degree of investment risk posed by its hedge fund investments. GAO Report at 25.

83.     Hedge funds also present investment risks beyond those posed by traditional investments.  These include over-reliance upon on the skills of the hedge fund manager, who often has broad latitude to engage in complex investment techniques that can involve various financial instruments in various financial markets, as well as the use of leverage and short selling, which amplifies potential gains and losses.

84.     Pension plans investing in hedge funds are also exposed to greater operational risks.  "Operational risk is the possibility of losses from systems, processes, technology, individuals or events."  Investor's Working Group Report at 34.  "Operational problems can arise from a number of sources, including inexperienced operations personnel, inadequate internal controls, lack of compliance standard and enforcement, efforts in analyzing, trading or recording positions, or out right fraud."  GAO Report at 27.

85.     Hedge fund managers are not subject to the same registration and reporting requirements as securities brokers and other investment fund managers.  Unlike mutual funds, hedge funds are not registered with the SEC and are therefore subject to very few regulatory controls.  The absence of such regulatory controls, coupled with the fact that many hedge funds make it difficult to for funds' assets to be marked to market, make hedge fund investments "especially prone to financial fraud."  *See* Dodd Testimony.

86.     "[P]articular care should be exercised in due diligence of hedge funds, because of the complex investment strategies they employ; the fact that hedge fund organizations are frequently young and small; their use of leverage and the associated risks; the possibilities of concentrated exposure to market and counterparty risks, and the generally more lightly regulated nature of these organizations."  Investor's Working Group Report at 12.  "The process of selecting and monitoring hedge fund investments requires additional resources and continuous support from experienced professionals, which may be substantially more expensive than those required to select and monitor traditional investments. Fiduciaries should understand the effort

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

1  and costs that will be required, and should commit these resources prior to investing in hedge

2  funds." *Id.* at 7.

3         87.     Finally, unlike most traditional investment products, hedge funds typically charge

4  both a management fee (typically 1-2%) based upon the amount of assets under management (the

5  "Management Fee") and an annual performance fee (typically 20%) based on the success of the

6  fund (the "Performance Fee").  "This fee structure typically exceeds the fees of traditionally

7  managed funds substantially.  The higher fee structure implies that an extra standard of care

8  should be undertaken by investors in hedge funds to determine if the higher fee is justified by the

9  risk adjusted value added potential of the investment."  *See* Principles and Best Practice for

10  Hedge Fund Investors, Report of the Investor's Committee to the President's Working Group on

11  Financial Markets ("Investor's Working Group Report") at 11.[8]

## C.    The Increased Risk & Costs Associated with Investing in Private Equity Investments

12
13        88.     The GAO Report describes private equity funds as follows:

14
15  > [T]he term generally includes privately managed pools of capital that
> invest in companies, many of which are not listed on a stock exchange.
> Although there are some similarities in the structure of hedge funds and
16 > private equity funds, the investment strategies employed are different.
> Unlike many hedge funds, private equity funds typically make longer-term
17 > investments in private companies and seek to obtain financial returns not
> through particular trading strategies and techniques, but through long-term
18 > appreciation based on corporate stewardship, improved operating
> processes and financial restructuring of those companies, which may
19 > involve a merger or acquisition of companies.  Private equity is generally
> considered to involve a substantially higher risk than traditional
20 > investment, such as stocks and bonds, for a higher return.  GAO Report at
> 10.

21
22        89.     As with investments in hedge funds, pension plans investing in private equity face

23  many challenges and risks beyond the risks of traditional investments.  Private equity funds are

24  prone to concentration risk in the underlying holdings because the funds typically hold a limited

25

26  ---
[8] Defendant Shariff is member of the Investors' Practices Committee that authored the Investors' Working Group Report.  *See id.* at 63.

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 27

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

number of underlying companies in their portfolio and often the companies are in the same industry or sector. *See* GAO Report at 33.

90.     Because private equity funds typically use leverage, their returns are susceptible to substantial variation.  For example, it has been reported recently that private equity funds who used borrowed funds to buy up public companies in the past are now finding it difficult in the current credit crunch to refinance the loans and bonds sold to finance these deals.  "Pension funds and college endowments that invested their money into these funds in recent years hoping for big returns are likely to suffer as well, and many of those investors could face a cash squeeze, as they are forced to hold onto their investments for years until the economy recovers."  Andrew Ross Sorkin and Michael De La Merced, *Debt Linked to Buyouts Tightens the Economic Vise*, New York Times, November 2, 2008.

91.     A further challenge of investing with private equity funds — regardless of how they perform — is that they often require commitments of 10 years or more.  A plan may not redeem invested capital or see any return on its investment, for at least several years and in some cases may be called upon by an equity fund manager to commit additional capital.  For example, it was recently reported that Goldman's Sachs Group, Inc.'s biggest real-estate private equity fund, the Whitehall Global Real Estate Limited Partnership 2007, informed its investors that $1 billion in additional committed capital was due from investors to repay $677 million on a line of credit and "finance a business plan that Whitehall says will recover 71% of investors' total equity over the fund's holding period."  Anton Troianovski and Lingling Wei, *Whitehall Cash Call Adds Insult to Losses,* The Wall Street Journal, May 15, 2009.

92.     Private equity funds provide the additional challenge that the assets of private equity funds are often hard to value.  Unlike stocks and bonds, the prices of which can obtained on publicly traded markets, plans have limited information on the value of private equity investments.  As a consequence, it may be difficult to assess how the fund has performed until the underlying investments are actually sold.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

93.     As in the case of hedge funds, private equity funds typically charge an annual fee of 2% of invested capital and 20% of returns, whereas mutual fund managers typically charge a fee of about 1% or less of assets under management.

94.     Generally speaking, greater effort and expertise is required in order to mitigate the challenges of investing in private equity than in making traditional investments.  Because of the complexities of investment strategies and the variations in performance among private equity funds, significant due diligence is required in the initial selection of such funds as well as in the ongoing monitoring of such investments.  As a result, private equity investments are more costly and time-intensive to manage than traditional investments.

**D.     Investments by Pension Plans and Other Trusts in Hedge Funds and Private Equity Investments**

95.     Although investments in hedge funds and private equity by private and public pension plans has grown in recent years, several recent surveys conducted of pension funds (both public and private) showed that fewer than half the pension funds surveyed have investments  in private equity and about one quarter have investments in hedge funds.  *See* GAO Report at 13 through 19.

96.     Among those pension plans that do invest in hedge funds and/or private equity, the investments generally represent a small share of the total plan assets.  According to the GAO Report one survey showed that "the average allocation to hedge funds among plans with such investments was about 4 percent in 2007" and "among plans with investments in private equity, the average was about 5 percent." *Id*. at 13.

97.     The GAO Report summarized the level of pension plan investments in alternative investments as follows:[9]

---

[9] The data on hedge fund and private equity allocations set forth in the GAO Report was based on a survey conducted by Pension and Investments in 2007 of the largest 200 plans, ranked by combined defined benefit and defined contribution plan assets.  Of the 200 plans surveyed, only 133 completed the survey and provided asset allocation information.  These 133 plans constituted the universe for which GAO reported asset allocations and did not include the Weyerhaeuser Plans that are the subject of this Complaint.  On information and belief, the plan that reported a 30% allocation to hedge funds (the highest in the GAO Report) was the Walt Disney Plan.  *See* "Appendix I: Objectives, Scope and Methodology" of the GAO Report.

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 29

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

Although the majority of plans with investments in hedge funds or private equity have small allocations to these assets, a few plans have relatively large allocations . . . . . Of the 62 plans that reported investments in hedge funds in 2007, 12 plans had allocations of 10 percent or more and, of those, 3 plans had allocations of 20 percent or more.  The highest reported hedge fund allocation was 30 percent of total assets.  Large allocations to private equity were even less common.  A total of 106 surveyed plans reported investments in private equity in 2007, of which 11 plans had allocations of 10 percent or more and, of those, 1 plan had an allocation of about 20 percent.  *Id.* at 13-14.

98.     Under the Investment Policy established by the Investment Committee, the Investment Manager Defendants have allocated significantly larger percentages of the Plans' assets held in the Master Trust to hedge funds and private equity investments than any of the plans surveyed in the GAO Report.

99.     Based on the GAO study, Weyerhaeuser's portfolio mix is a dramatic outlier, with a 53% allocation to hedge funds and 24% allocation to private equity in 2007.  Based on the findings in the GAO Report and on information and belief, no other pension fund comes close anywhere close to the Weyerhaeuser's outsized allocation of pension assets to hedge funds and private equity.

**E.     Overfunding of the Weyerhaeuser Plans**

100.     As reported in the annual 10-K, the Plans were overfunded from 2003 to 2007.

101.     By the end of 2007, the pension plans sponsored by the Company (the majority of whose assets were composed of the assets of the Plans held in Master Trust) were collectively overfunded by **$2.1 billion**.[10]

102.     However, despite being overfunded by over $2 billion, Defendants continued to allocate 80%+ of the Master Trust to alternative investments.  Defendants continued this aggressive, risky and costly investment strategy to enhance the Company's financial reporting, not to benefit the participants of the Plans, who rely on the Master Trust to pay their retirement benefits.

---

[10] As reported in the 2008 Weyerhaeuser 10-K, the actual value of Weyerhaeuser's pension assets at December 30, 2007 was $6.9 billion.  The 2007 Weyerhaeuser 10-K reported that the benefit obligations of the plans sponsored by the Company were $4,793,000,000.

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 30

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

103.    A New York Times article dated November 27, 2005, reported:

> Weyerhaeuser's big position [in hedge funds] has significant benefits for the company. Accounting rules let companies factor expected pension returns into their operating income; Weyerhaeuser's hedge-fund-laden portfolio allows it to claim expected annual returns of 9.5 percent. By comparison, the 100 largest companies that sponsor pension funds predicted last year that their average long-term returns would be 8.5 percent, according to Milliman Inc., an actuarial firm.

Riva D. Atlas and  Mary and Williams Walsh, *Pension Officers Putting Billions Into Hedge Funds*, New York Times, Nov. 27, 2005.

104.    As explained in the Herald Tribune on November 28, 2005:

> Accounting rules let companies factor expected pension returns into their operating income, and Weyerhaeuser's portfolio, which is heavy on hedge funds, allows it to claim expected annual returns of 9.5 percent. For Weyerhaeuser, each increase of 0.5 percentage points in the expected rate of return is worth an additional $21 million to the company's pretax income this year, according to filings with the U.S. Securities and Exchange Commission.

*See* Mary Williams Walsh and Riva D. Atlas, "Pension plans turn to richer, shakier ground" International Herald Tribune, Nov. 28, 2005.

105.    The significant accounting policies summarized in the "Notes to the Weyerhaeuser Consolidated Statement" for the period ended December 30, 2007, contained in the 2007 10-K states:

> We recognize the overfunded and underfunded status of our defined benefit pension and other postretirement plans on our balance sheet and recognize changes in that funded status, in the year in which the changes occur, through comprehensive income.

106.    The Weyerhaeuser 2007 Financial Statement states that the Company included in Consolidated Statement of Shareholders Interest and Comprehensive Income under the heading "Other Comprehensive Income"  $644 million, which amount represented the "changes in unamortized net pension and other post retirement benefit gain, net of tax expense of $438 [million] in 2007."  Of this amount $584 million represented the "Net gain (net of taxes)" for the Company's pension plans, the majority of which gains were experienced by the Plans.  The inclusion of the net gain experienced by the Company's pension plans, which largely resulted

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 31

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

from the gains to the Plans as a result of the implementation of the Investment Policy, increased the total "Comprehensive income" reported on the Company's Financial Statements by $584 million from $1.1 billion to $1.7 billion.

107.    The assets statement on the 2007 Financial Statement of the Company listed among the Company's "Current assets" $2.5 billion in "Deferred pension and other assets," which amount, on information and belief, included the $1.9 billion in overfunding in the Company's pension plans, most of which amount represented the overfunding in the Plans.  As a consequence the Company reported total assets of $23.8 billion as of December 30, 2007.  On information and belief, without the inclusion of the overfunding in the Company's pension plans in the Asset Statement, most of which overfunding was that of the Plans, the total assets of the Company as of December 30, 2007, would have been 9% less or approximately $22 billion.

**F.    The Decline in the Value of the Assets of the Weyerhaeuser Plans in the Fourth Quarter of 2008 and the Resulting Underfunding of the Plans**

108.    As a result of the excessive risk in the Master Trust's portfolio and the overconcentration in alternative investments (including 53% in hedge funds, 24% in private equity as of December 2007), the Master Trust lost $2.4 billion (or 41% of its value) in 2008 including a loss of approximately 30% in just the 4th quarter alone.  Rather than outperforming its targeted benchmark, the Master Trust underperformed its benchmark by 27% in 2008 and was essentially flat with the benchmark in 2009 and 2010.

109.    A regression analysis of the Master Trust's portfolio from 2000 to 2010 as compared to its targeted 60/35/3 benchmark produces a beta of 1.78 with a negative though insignificant alpha of -1.5%.  The beta of 1.78 means that the Master Trust had almost twice the risk of its benchmark between 2000 to 2010, which indicates that the Defendants have systematically underestimated the amount of risk in the portfolio and thus failed to appropriately rebalance that risk to be no greater than its targeted benchmark.  As a result from 2000 to 2010,

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

the portfolio had significantly greater volatility and market exposure than is allowed by the investment policy.[11]

110.    The negative but insignificant alpha term indicates that, over time, no excess return or performance (alpha) is being generated.  Indeed, the negative alpha indicates that the outperformance from 2000 to 2007 (when compared to the benchmark) was the result of excess beta or risk in the portfolio, not alpha.  If the Investment Manager Defendants were actually assessing the risk of the portfolio properly, they knew or should have known that the Master Trust consistently had almost twice as much risk as its targeted benchmark and thus would significantly underperform the benchmark in a market downturn as was the case in 2008.

111.    In short, the regression analysis shows that in reality the portfolio of investments selected and maintained by the Investment Manager Defendants was almost twice as risky as the targeted benchmark but did not produce the excess returns/alpha that it was intended to produce. As such, the Investment Manager Defendants failed to adhere to the Investment Policy, which provided that the total risk or beta in the Master Trust's portfolio remain commensurate with the risk of the targeted benchmark.

112.    Moreover, given the shear number of alternative investments (approximately **330** different hedge funds, private equity investments, and real estate funds), it was practically impossible for the Investment Manager Defendants to properly assess and accurately rebalance the embedded risk associated with each of the 330 alternative investments, including the combined risk of the portfolio as a whole.[12]

113.    As a result of the number of alternative investments chosen, it is not surprise that the Investment Manager Defendants systematically miscalculated the amount of risk in the alternative investment portion of the portfolio.  This resulted in the Master Trust's assets being

---

[11] As discussed *supra*, the portfolio is "intended to allow the assets of the Master Trust to perform comparably with established benchmarks. . . The Master Trust utilizes options and swaps to manage liquidity, to rebalance the portfolio to its core asset allocation targets which are set forth in the Master Trust's investment policy and to maintain exposure to core investment strategies."

[12] In the Form 5500, Defendants state that "Each investment and overlay position's exposure to the asset classes in the target asset mix is determined separately and the portfolio is re-balanced to the target asset mix as needed."

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 33

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

exposed to almost twice as much risk as the targeted benchmark, which caused the Master Trust to lose $2.4 billion (or 41% of its value) in 2008 alone.

114.    In addition, the Investment Manager Defendants, the Investment Committee Defendants and Weyerhaeuser knew or should have known that such a large allocation to alternative investments presented significant investment challenges that demanded greater expertise and effort on the part of the investment managers than more traditional investments and exposed the assets of the Plans to inordinate operational and investment risks.

115.    The predictably large losses suffered by the Plans in 2008 were in part the result of the Investment Committee's adoption and maintenance of an Investment Policy that permitted an imprudent allocation of the Plans' assets in risky, illiquid and hard to manage alternative investments, even though they knew or should have known that such investments were unduly risky and represented an inappropriate investment allocation for pension assets.

116.    Had the Investment Committee Defendants adopted an Investment Policy that protected the principal of the Master Trust's assets to ensure that it remained adequately funded and able to pay benefits, the Plans would not have lost $2.4 billion in 2008 causing them to become underfunded.   In reality the Investment Committee Defendants adopted a complicated and risky Investment Policy that allowed the Investment Managers to allocate approximately 80% of the Plans' assets to alternative investments in an effort enhance the financial statements of the Company and decrease the Company's obligation to make contributions to the Plans, in violation of their ERISA duties of prudence, loyalty and diversification.

117.    In sum, the Investment Manager Defendants failed to properly assess and manage the risk in the 330 alternative investments, thereby exposing the Master Trust to excessive risk. Under the circumstances, the resulting risks undertaken by the fiduciaries of the Plans, including the Investment Manager Defendants, the Investment Committee Defendants, and Weyerhaeuser, was inappropriate for the Plans, which, along with the other pension plans of the Company, were collectively overfunded by more than $196 million at the end of 2005, $843 million at the end of

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 34

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
COHEN MILSTEIN SELLERS & TOLL, PLLC.
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

2006, and $2.1 **billion** at the end of 2007, and did not need to take on excessive risk to remain fully funded to meet the benefit obligation of the Plans to their participants and beneficiaries.

118.     The end result of collective breaches of fiduciary duties by all the Defendants was a complicated and expensive shell game, at the cost of enormous fees and exposing the plans to risks of loss far in excess of the benchmark portfolio.  The Defendants achieved outsized returns when the broad market performed well, but assured a catastrophe when the market declined.  As explained below, Defendants' strategy as implemented separately exposed the plans to disastrous liquidity risks by investing almost the entire portfolio in illiquid assets.  Disaster was averted only by the Weyerhaeuser's willingness and ability to lend the Plans $200 million without interest to allow the Plans to pay benefits.

119.     In fact, together the Defendants caused the assets of the Master Trust to sharply decline in value and caused the Company's pension plan assets (which include the assets of the Master Trust) to dramatically shift from being overfunded by $2.1 billion to being underfunded by $450 million just one year later, thereby jeopardizing the retirement income of the Plaintiff.[13]

120.     Following the decline in the value of the assets of the Company's pension plans, the Plans experienced liquidity problems.  The Company reported in the 2008 10-K  the following:

> . . . . recent market events have adversely affected liquidity [of the Company's pension plans]. For instance, many of the funds in which plan assets are invested have changed their redemption terms, delaying some of the pension trusts' expected cash receipts. To avoid liquidating assets at depressed prices and, as permitted by law, we elected to provide approximately $200 million of short-term liquidity to the U.S. pension trust through short-term loans. These short-term loans were made in the fourth quarter of 2008. Repayment by the pension trust is planned in 2009.

---

[13] In its 2008 10-K, the Company reported that the actual value of its pension plan assets was $6.9 billion and the benefit obligation of the Company's pension plans was $4.793 billion as of 2007, resulting in an overfunding of $2.1 billion as of 2007.  *See* pp. 82-83 of the Company's 2008 10-K.  The value of the Company's pension plan assets as of 2008 was $4.132 billion and the benefit obligation of the Company's pension plans was $4.426 billion. *Id*.  However, the revised year-end value of the Company's pension plan assets as reflected in the 10-Q for the First Quarter of 2009, reflected a $150 million increase in the underfunding for the Company's pension plan, and brought the total underfunding for the pension plans at the end of 2008 to approximately $450 million.

COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT - 35

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

121.    The Company later reported that in the first quarter of 2009, it provided an additional $85 million of short-term liquidity to the U.S. pension trust through short-term loans, bringing the total receivable from the pension trust to $285 million.[14]

122.    Moreover, a portable alpha strategy adds extra costs: not only does the Master Trust pay the active manager's fees, but it also absorbs the costs of the derivative transactions needed to rebalance the embedded betas.  Therefore it is not clear that a portable alpha strategy benefits investors when costs are taken into account.  This is especially true for defined benefit plans where the benefits paid to participants and beneficiaries are fixed and retirees do no benefit from any potential excess returns.  However, if the plan suffers severe losses from this overly risky strategy, this jeopardizes the retirement benefits of participants and beneficiaries.

## VII.   CLASS ALLEGATIONS

123.    **Class Definition**.  Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (2), on behalf of himself and the following Class:

> All participants who are vested in accrued benefits in the Plans from January 1, 2006 to the present and their beneficiaries.  Excluded from the Class are Defendants and members of their immediate families or any of their heirs, successors or assigns.

124.    **Numerosity**.  The members of the Class are so numerous that joinder of all members is impracticable.  There were more than ninety thousand participants in the Plans as of December 31, 2006.

125.    **Commonality**.  As to the members of the Class, this case presents numerous common questions of law and fact, among them:

a.    Were the Defendants or any of them fiduciaries of the Plans within the meaning of ERISA as a result of their roles with respect to the creation and/or implementation of the Investment Policy of the Plan and/or the investment of the Plans' assets in alternative investments, including hedge funds and private equity?

---

[14] The Company's pension plans remain underfunded.  As of December 31, 2009, the plans were underfunded by $600 million and as of December 31, 2010, the plans were underfunded by $494 million.  *See* Weyerhaeuser's 2009 and 2010 Forms 10-K.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

b.      Did the Defendants or any of them breach their fiduciary obligations under ERISA to prudently manage the Plans' assets by causing or allowing the Plans to invest up to 81% of the Plans' assets in alternative investments, including hedge funds and private equity investments?

c.      Did the Defendants or any of them breach their fiduciary obligations under ERISA to act loyally and solely in the interest of the participants and beneficiaries of the Plans by causing or allowing the Plans to pursue an investment strategy which exposed the assets of the Plans to inordinate risk in order to enhance the Company's balance sheet by increasing annual returns and boosting earnings per share?

d.      Were the Plans and the Class members harmed by the breaches of fiduciary duty committed by the Defendants or any of them as described herein?

e.      Are the Plans entitled to recover losses from the Defendants or any of them caused by their breaches of fiduciary duty?

126.    **Typicality**.  Plaintiff's claims are typical of those of the Class they seek to represent because (a) to the extent that Plaintiff seeks relief on behalf of the Plans pursuant to § 502(a)(2) of ERISA his claims are not only typical of, but the same as a claim under this section brought by any other Class Member;  (b) to the extent that Plaintiff seeks equitable relief, that relief would affect all class members equally; all of the Class members were injured and continue to be injured in the same manner by Defendants' breaches of fiduciary duty.

127.    **Adequacy**.  Plaintiff will fully and adequately protect the interests of all members of the Class.  Plaintiff has retained counsel who are experienced in class action and ERISA litigation, and Plaintiff has no interests antagonistic to or in conflict with the interests of the Class.

128.    **Rule 23(b) (1) Requirements**.  Class action status in the this ERISA action is warranted and appropriate under Rule 23(b)(1) because prosecution of separate actions by the

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 37

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

members of the Class would create a risk of establishing incompatible standards of conduct for Defendants and create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

129.    **Rule 23(b) (2) Requirements**.  Class action status is also warranted under the Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole;

130.    **Rule 23(b) (3) Requirements**.  If the Class is not certified under Rule 23(b)(1) or (b)(2) then certification under (b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VIII.   CAUSES OF ACTION

**A.    COUNT I:    Breach of ERISA Fiduciary Duties by Adopting and Maintaining the Investment Policy**

   **(asserted against Weyerhaeuser and the Investment Committee Defendants)**

131.    Plaintiff hereby realleges and incorporates by reference the allegations of the preceding paragraphs.

132.    This Count alleges fiduciary breaches against Weyerhaeuser and the Investment Committee Defendants.

133.    ERISA § 404(a)(1)(A) requires that a fiduciary act solely in the interest of the participants and beneficiaries of the plan they serve and "(A) for the exclusive purpose of : (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

134.    ERISA § 404(a)(1)(B) requires that a fiduciary discharge his duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

135.    ERISA § 404(a)(1)(C) requires that a fiduciary diversify the investments of the Plans so as to minimize the risk of large losses.  29 U.S.C. § 1104(a)(1)(C).

136.    As set forth in detail supra, Weyerhaeuser and the Investment Committee Defendants were fiduciaries within the meaning of ERISA § 3(21),  with respect to the management and disposition of the assets in the Master Trust and as such owed duties of loyalty, prudence and diversification to the Plaintiff and Class members under ERISA.  These Defendants breached those duties by, *inter alia*:

a.    Adopting and maintaining the Investment Policy which even if properly implemented, allowed an imprudent allocation of the Plans' assets in alternative investments that were unduly risky, illiquid, hard to manage,  hard to value and hard to assess for riskiness, even though they knew or should have known that such investments represented an inappropriate investment allocation for pension assets;

b.    Adopting and maintaining the Investment Policy which permitted the over-concentration of the 81% of the Plans assets in alternative investments by December 2007 rather than properly diversifying the investments of the Master Trust by including more traditional investments to assure the liquidity of the Pension Fund portfolio so that hard to liquidate alternative investments did not need to be sold or redeemed when market conditions were adverse;

c.    Adopting and maintaining the otherwise risky and imprudent Investment Policy in order to permit Weyerhaeuser to project the extraordinarily high rates of return for the Plans' investments to enhance the Company's financial statements and benefit the Company at the expense of the Plans; and

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 39

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

d.    Maintaining an investment policy so difficult to monitor and implement that it exposed the Plans to almost twice as much risk as the Master Trust portfolio's targeted benchmark, at a time when the Plans were grossly overfunded and the continued pursuit of such an investment policy to secure a high rate of return on the Plans' investments would not result in any greater pension benefits or pension security for the Plan participants and their beneficiaries, but would redound to the benefit of Weyerhaeuser.

137.    As a result of the above-described conduct, Weyerhaeuser and the Investment Committee Defendants have:

a.    failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b.    failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); and

c.    failed to diversify the investments of the Plans so as to minimize the risk of large losses, in violation of ERISA § 404(a)(1)(C) , 29 U.S.C. § 1104(a)(1)(C).

138.    As such, these Defendants are liable to restore to the Plans the losses suffered by the Plans as a result of their breaches and to cause the Plans to again be fully funded to satisfy their accumulated benefit obligations to the participants of the Plan.

**B.    COUNT II:    Breach of ERISA Fiduciary Duties by Failing to Properly Implement the Investment Policy and Prudently Invest the Assets of the Plans**

**(asserted against Morgan Stanley, Northwater and WAM)**

139.    Plaintiff hereby realleges and incorporates by reference the allegations of the preceding paragraphs.

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 40

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

140.    This Count alleges fiduciary breaches against Morgan Stanley, Northwater and WAM (collectively the Investment Manager Defendants).

141.    As fiduciaries, the Investment Manager Defendants were required by ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) to prudently invest and manage the Plans' assets.

142.    As fiduciaries, the Investment Manager Defendants were also required by ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) to act in accordance with the documents and instruments governing the plan, including the Investment Policy.

143.    The Investment Manager Defendants breached their fiduciary duties by, *inter alia*:

a.    Failing to adhere to the Investment Policy, which provides that the total risk or beta in the Master Trust's portfolio remain commensurate with the risk of the targeted benchmark;

b.    Systematically miscalculating the amount of risk in the alternative investment portion of the portfolio, which resulted in the Master Trust's assets being exposed to almost twice as much risk as the targeted benchmark, causing the Master Trust to lose $2.4 billion (or 41% of its value) in 2008;

c.    Investing in an imprudently large number of alternative investments (approximately 330 different hedge funds, private equity investments, and real estate funds), which effectively prevented the Investment Manager Defendants from properly assessing the amount of risk in the alternative investment portion of the portfolio and properly rebalancing the total risk to ensure that as a whole, the portfolio was no more risky than the targeted benchmark; and

d.    Failing to perform adequate due diligence given the significant risks and challenges associated with hedge fund and private equity investments,

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
COHEN MILSTEIN SELLERS & TOLL, PLLC.
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

1   which demand greater expertise and effort on the part of fiduciaries than

2   traditional investments.

3   144.   As a result of the above-described conduct, the Investment Manager Defendants:

4   a.   failed to act with the care, skill, prudence and diligence under the

5   circumstances then prevailing that a prudent man acting in a like capacity

6   and familiar with such matters would use in the conduct of an enterprise of

7   a like character and with like aims, in violation of ERISA § 404(a)(1)(B),

8   29 U.S.C. § 1104(a)(1)(B); and

9   b.   failed to act in accordance with the documents and instruments governing

10   the plan, including the Investment Policy in violation of ERISA

11   § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

12   145.   As such, the Investment Manager Defendants are liable to restore to the Plans the

13   losses suffered by the Plans as a result of their breaches and to a cause the Plans to again be fully

14   funded to satisfy their accumulated benefit obligations to the participants of the Plan.

15   **C.   COUNT III:  Failure to Monitor Other Fiduciaries, Including the Investment
      Manager Defendants**

16

17   **(asserted against Weyerhaeuser and the Investment Committee Defendants)**

18   146.   Plaintiff hereby realleges and incorporates by reference the allegations of the

19   preceding paragraphs.

20   147.   This Count alleges fiduciary breaches against Weyerhaeuser and the Investment

21   Committee Defendants (collectively the "Monitoring Defendants").

22   148.   As fiduciaries, these Defendants were required by ERISA § 404(a)(1)(A),

23   29 U.S.C. § 1104(a)(1)(A) to manage and administer the Plans, and the Plans' investments

24   "solely in the interest of the participants and beneficiaries" of the Plans and for the "exclusive

25   purpose" of providing benefits to the participant and beneficiaries of the Plans.

26   149.   Under ERISA, a fiduciary charged in a plan document with the authority to select

and remove other fiduciaries has an ongoing duty to monitor the performance of those persons

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 42

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

1   whom the fiduciary may remove at reasonable intervals to ensure that their performance has been

2   in compliance with the terms of the plan and statutory standards, and satisfies the needs of the

3   plan.

4   150.   As previously alleged, the Monitoring Defendants were responsible for the

5   appointment and removal of the Investment Managers and for periodically monitoring the

6   investment performance of the Investment Managers who managed the assets of the Plan in

7   accordance with the Investment Policy adopted by the Investment Committee.  The Monitoring

8   Defendants breached that duty by, *inter alia*:

9   a.   Permitting the Investment Manager Defendants who managed the assets of

10      the Plans to expose such assets to almost twice as much risk as the

11      targeted benchmark and as a result to lose $2.4 billion (or 41% of its

12      value) in 2008;

13   b.   Permitting the Investment Manager Defendants to allocate more than 81%

14      of the Plans' assets (by December 2007) to risky, hard to manage

15      alternative investments, including hedge funds and private equity

16      investments even though the Monitoring Defendants knew or should have

17      known that such investments were unduly risky and represented an

18      inappropriate investment allocation for pension assets;

19   c.   Failing to ensure that the Investment Manager Defendants performed

20      adequate due diligence given the significant risks and challenges

21      associated with hedge fund and private equity investments, which demand

22      greater expertise and effort on the part of fiduciaries than traditional

23      investments; and

24   d.   Failing, with respect to the Plans investments in alternative investments, to

25      limit the numbers of hedge fund and private equity investments invested in

26      by the Investment Managers and to restrict the percentage of the Plans'

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

1  total assets which were allocated by the Investment Managers to such

2  investment categories.

3  151.   As a result of the above-described conduct, the Investment Committee Defendants

4  have breached their fiduciary obligations to monitor the Investment Managers.  As such, these

5  Defendants are liable to restore to the Plans the losses suffered by the Plans as a result of their

6  breaches and to a cause the Plans to again be fully funded to satisfy their accumulated benefit

7  obligations to the participants of the Plan.

8  **D.     COUNT IV:  Co-Fiduciary Liability**

9  **(asserted against all the Defendants)**

10  152.   Plaintiff hereby realleges and incorporates by reference the allegations of the

11  preceding paragraphs.

12  153.   This Count alleges fiduciary breaches against Weyerhaeuser, the Investment

13  Committee Defendants and the Investment Manager Defendants (collectively the "Co-Fiduciary

14  Defendants").

15  154.   As alleged above, during the Class Period the Co-Fiduciary Defendants were

16  named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries

17  within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were

18  bound by the duties of loyalty, exclusive purpose, and prudence.

19  155.   Section 405(a)(1) of ERISA, 29 U.S.C. § 1105(a)(1) imposes liability on a

20  fiduciary, in addition to any liability which he may have had under any other provision of

21  ERISA, if he knowingly participates in a breach of fiduciary duty of another fiduciary. Section

22  405 (a)(2) of ERISA, 29 U.S.C. § 1105(a)(2) imposes liability if a fiduciary in the administration

23  of his fiduciary responsibilities enables another fiduciary to commit a breach. Section 405 (a)(3)

24  of ERISA, 29 U.S.C. § 1105(a)(3) imposes liability on a fiduciary, in addition to any liability

25  which he may have had under any other provision of ERISA, if he knows of a breach by another

26  fiduciary and fails to remedy it.

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 44

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

156.    The Co-Fiduciary Defendants, each of whom were fiduciaries within the meaning of ERISA, knew of each breach of fiduciary duty alleged herein against each of the others arising from the imprudent investment of the assets of the Master Trust and took no steps to remedy those breaches.  As such, each is liable for the breaches of the others pursuant to ERISA § 405(a)(3).

157.    The Co-Fiduciary Defendants, establishing and implementing an unduly risky and inappropriate Investment Policy, and are therefore liable for the breaches of the Investment Managers pursuant to ERISA § 405(a)(2).

158.    The Co-Fiduciary Defendants, by permitting the Investment Manager Defendants to expose the Plans' assets to excessive risk for the benefit of the Company and to the detriment of the Plans' participants and are liable for the breaches of the Investment Managers under pursuant to ERISA § 405(a)(3).

159.    The Co-Fiduciary Defendants, who were responsible for the development of the Investment Policy adhered to by the Investment Managers and for monitoring the investment performance of  the Investment Managers, each participated in the failure of the Investment Manager Defendants to prudently invest the assets of the Plans.  As such, the Co-Fiduciary Defendants are each liable for the breaches of the others in which they participated pursuant to § 405(a)(1) of ERISA.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant in the following manner:

A.    Certification of Plaintiff as representative of a Class pursuant to Fed. R. Civ. P. 23(b)(1)(A)(B) & (b)(2);

B.    A declaration that the Defendants have breached their fiduciary duties to the Class in the manner described herein;

C.    Payment by the Defendants of any losses suffered by the Plans as a result of the violations of ERISA detailed above.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
**COHEN MILSTEIN SELLERS & TOLL, PLLC.**
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600

F.      The costs and expenses of this suit, including expenses for expert witnesses and reasonable attorneys fees; and

G.      Such other and further relief as the Court deems just and necessary.

DATED:          April 25, 2010.

KELLER ROHRBACK L.L.P.


 s/ Erin M. Riley
Lynn Lincoln Sarko, WSBA #16569
Derek W. Loeser, WSBA #24274
Erin M. Riley, WSBA #30401
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384
Email:  lsarko@kellerrohrback.com
        dloeser@kellerrohrback.com
        eriley@kellerrohrback.com

COHEN MILSTEIN SELLERS & TOLL, PLLC.
Bruce Rinaldi
Karen L. Handorf
Michelle C. Yau
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C.  20005
Tel: (202) 408-4600
Fax: (202) 408-4699
Email:  brinaldi@cohenmilstein.com
        khandorf@cohenmilstein.com
        myau@cohenmilstein.com

Marc I. Machiz
255 South 17th Street, Suite 1307
Philadelphia, PA 19103
Tel: (267) 773 4680
Fax: (267) 773 4690
Email:  mmachiz@cohenmilstein.com

Attorneys for Plaintiff

COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 46

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
COHEN MILSTEIN SELLERS & TOLL, PLLC.
1100 NEW YORK AVENUE, N.W.
SUITE 500, WEST TOWER
WASHINGTON, DC  20005
TELEPHONE: (202) 408-4600